# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-KM-00192 -SCT

*ERWYN FREEMAN a/k/a ERWYN E. FREEMAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/29/2011 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | CHARLES RICHARD MULLINS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| | JOHN R. HENRY, JR. |
| | SCOTT STUART |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - MISDEMEANOR |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND RENDERED - 05/30/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     In this conviction for driving under the influence ("DUI") first offense, speeding, and littering, the State lost key evidence prior to the defendant's de novo trial in county court, while it was under a court order to preserve the evidence. The State's actions violated the defendant's due process right to present a complete defense. Further, the county court improperly admitted proof of the radar device's accuracy under the business records hearsay exception. However, sufficient evidence to support the defendant's speeding conviction

exists in the officer's testimony regarding the defendant's speed. Thus, this Court reverses the DUI conviction and renders judgment in favor of the defendant. This Court affirms the speeding conviction, because it is supported by sufficient evidence. The defendant does not adequately contest the littering conviction; thus this Court affirms his littering conviction.

## FACTS AND PROCEDURAL HISTORY

¶2. On September 8, 2008, Mississippi Highway Patrol Officer Phillip Patrick stopped the vehicle driven by Dr. Erwyn Freeman on Highway 51 in Madison County. The facts surrounding the stop are hotly contested. Officer Patrick recorded the entire stop on video. As a result of the stop, Officer Patrick arrested Freeman for DUI and transported him to the Madison County Sheriff's Department. After observing Freeman for an appropriate time period and informing Freeman of his right to refuse chemical tests to determine blood alcohol content ("BAC"), Officer Patrick administered the Intoxilyzer test. Officer Patrick administered the test twice, and Freeman's BAC was determined to be .09. Officer Patrick issued Freeman tickets for DUI first offense, careless driving, speeding, and littering. Freeman was ordered to appear in the Madison County Justice Court.

¶3. Freeman entered a plea of "not guilty." A justice court hearing was ultimately set for March 11, 2009. On October 30, 2008, Freeman propounded a subpoena duces tecum on Officer Patrick, requesting that Officer Patrick produce "[a]ny and all police reports, statements, *video tapes*, audio tapes, and any other evidence relating to the September 8, 2008 traffic stop involving Erwyn Freeman" within ten days of service. (Emphasis added.) Neither the prosecutor nor Officer Patrick produced the video recording of the stop in response to this subpoena. The Madison County Justice Court held trial on March 11, 2009,

2

and at that trial, defense counsel first learned of the video of Freeman's stop. The video was played in justice court, and Freeman maintains that the video reveals that the facts of the stop were quite different from the facts as later testified to by Officer Patrick. The justice court found Freeman guilty of DUI first offense, speeding, littering, and careless driving. At the end of the trial, Freeman requested the video be preserved pending appeal.

¶4. Freeman appealed his guilty verdicts to the County Court of Madison County, requesting a trial de novo. A trial was scheduled to occur in the county court on May 29, 2009. On April 17, 2009, the State requested a lengthy continuance because Officer Patrick would be on active military duty on May 29, 2009, and would remain on active military duty until November 2009. Freeman noted his concerns in agreeing to the continuance, including that he would be waiving his speedy trial rights, among others. However, he ultimately agreed to the continuance "so long as it is noted on the record that he wishes all evidence be preserved, *specifically the video of the arrest*, and does not waive any objections/rights if any such evidence is missing and/or destroyed." (Emphasis added.) In response, the court granted the continuance and ordered that "all evidence in this case be preserved and should any evidence be lost or destroyed, the Defendant preserves any and all defenses he has under the United States and Mississippi Constitutions relating to lost or destroyed evidence."

¶5. On August 7, 2009, Freeman propounded general discovery on the State, which was sufficiently broad to cover the video. The State responded to Freeman's discovery requests on December 11, 2009, replying that the video had been destroyed. It stated that, during Officer Patrick's absence, "the laptop with the recording in question was housed and kept at DPS. Upon Trooper Patrick's return to work in November 2009, it was discovered that the

3

hard drive for said laptop was corrupted and many files were lost. DPS technicians have attempted to recover this recording of the Defendant's stop and arrest but were unsuccessful." In response, Freeman filed a Motion to Dismiss, which the court denied. The court did, however, determine that it would infer that the video would have been favorable to Freeman with respect to any contested issues.

¶6. At trial, the facts were hotly contested. Freeman maintained that the destroyed video showed Freeman's vehicle abiding by traffic laws, showed that his speech was not slurred, and showed that his coordination was not impaired. He claims that the video showed the results of Freeman's preliminary breath tests ("PBT"), and also revealed Officer Patrick speaking with dispatch about Freeman's PBT levels going down and that he did not want to "waste his time" if Freeman was not under the influence. He states that the video reveals Officer Patrick cancelling the wrecker he called and stating that he was going to allow someone to pick up Freeman. It shows that Officer Patrick then asked Freeman to take the PBT once more, and Freeman questioned the officer as to why he had to take yet another PBT test. At that point, Officer Patrick arrested Freeman.

¶7. Officer Patrick testified on direct examination that as he was driving southbound on Highway 51, he observed Freeman's vehicle, also traveling southbound, which "appeared to have been running off the road."[1] After Officer Patrick allegedly witnessed Freeman

---

[1]Officer Patrick further responded to questioning on direct examination:
Q: Initially, you said he ran off the road. Did he run all the way off the road?
A: Right. It was – the vehicle went from one side – I can't recall if the left first or the right first, but it ran off one side and came back.
The DUI ticket issued also contained a notation by Officer Patrick that states that Freeman "ran off road." On cross-examination, Freeman's counsel asserted that the destroyed video

4

swerve, Officer Patrick approached Freeman's vehicle from behind. Officer Patrick testified that he then estimated Freeman's speed by following him. Because Freeman was exceeding the posted speed limit of fifty-five miles per hour, he initiated his radar, and it displayed a speed of sixty-nine miles per hour. The Radar Unit Certification introduced into evidence was not a certified copy. After gauging Freeman's speed while following Freeman, Officer Patrick activated his blue lights and his video and pulled Freeman over.

¶8.    Officer Patrick testified that when he initially pulled Freeman over, Freeman threw a cup under the vehicle. Officer Patrick maintained that, when he approached the vehicle, he smelled the presence of alcohol. He asserted that Freeman stated that he drank two beers. Freeman asserts that he never stated that he drank two beers. Both Freeman and Officer Patrick agree that what he did or did not say regarding drinking beer was on the destroyed videotape.

¶9.    Officer Patrick then maintained that Freeman's speech was slurred and his coordination impaired. Freeman used Officer Patrick's justice court testimony, which was given when the video was readily available, on cross-examination to elicit the following testimony regarding Freeman's impaired coordination:

> Q: And I asked you a question: "Now, on the videotape – we're going to put that on in a minute – Dr. Freeman had no problems with his coordination on this video, did he?" What was your answer?

---

showed Freeman's vehicle traveling without swerving. Officer Patrick stated that you could not tell that Freeman's vehicle was swerving on the video, but stated that he could tell from his vehicle that Freeman was swerving. Further, Officer Patrick changed his testimony regarding Freeman running off the road. On cross-examination, he testified that Freeman merely swerved within his own lane. The county court ultimately found Freeman not guilty of careless driving.

A: I said, "No, sir."

Q: So in March of 2009, when I asked you about his coordination, you said it was not impaired, correct?

A: Sir, my recollection of impaired it's the vision, as far as Mr. Freeman's eyes and everything. But as far as the staggering, I clearly observed Mr. Freeman stagger slightly as he exited the vehicle.

. . .

Q: So you dispute that on the videotape it shows those things?

A: Sir, me and you both watched that video. You may assume or say that he doesn't have a stagger. When I say he staggered, it was a slight – as I testified earlier, it was a slight stagger. It wasn't one that was very obvious, and I testified that it was a slight stagger in Mr. Freeman's walk as he exited the vehicle.

Q: But when I specifically asked you that while were [sic] watching that video in March of 2009, was his coordination was [sic] impaired, you told me "no, sir."

A: Sir, the coordination – what I mean by coordination, as far as Mr. Freeman's his eyes or anything. But as far as his staggering, Mr. Freeman did stagger slightly as he exited the vehicle.

Q: So you don't consider staggering a part of coordination?

A: It is part of coordination. I answered that question, sir. Mr. Freeman did stagger as he exited the vehicle.

Freeman further used Officer Patrick's justice court testimony to cross-examine him regarding Freeman's allegedly slurred speech:

Q: Do you remember when I asked you in the court below about his speech and you said his speech wasn't slurred?

A: No, sir. I can't recall that.
. . .

Q: And this is my question: "And you don't know how he talks or how he

6

walks or anything like that?" Your answer was: "Did I say he had slurred speech? No, sir, I did not."

. . .

Q: So didn't you tell me back then that he didn't [sic] say he had slurred speech?

A: Sir, I can't recall.

Q: Well, you saw your testimony?

A: I saw what's written in your book. I can't recall stating that Mr. Freeman did not have slurred speech.

Q: Well, do you have any recollection – any records to refresh your memories to that?

A: As I stated earlier, Mr. Freeman was – I asked Mr. Freeman where he was headed that night. He did explain – tell me that he was looking for three dogs.

Q: Officer, I don't mean to interrupt you, but I mean specifically as it relates to your statements that you're talking about his slurred speech?

A: Yes, sir. That's what I was explaining to you. As he was explaining where he was headed and that he was looking for the three dogs, that's when I observed Mr. Freeman's speech was slurred.

Q: But when I asked you about that in the court below based on what we just saw, you denied he had slurred speech, didn't you?

A: Sir, I can't recall that.

Q: Did you see your testimony?

A: I saw what you had written in that book. Yes, sir.

Q: You saw what I had written in it?

A: Yes, sir.

Q: That a court reporter did?

A: I saw the book.  Yes, sir.

Q: But it's clear, without you and I discussing it on that videotape, you can hear Dr. Freeman talking?

A: Yes, sir, you could.

. . .

Q: You can tell if he's got slurred speech by looking at the videotape?

A: By hearing the voice?

Q: Yes, sir.

A: Yes, sir.

Q: But we don't have that video, do we?

A: No, sir, we don't.

¶10.    Officer Patrick testified that, after observing Freeman, he administered a PBT, which indicated the presence of alcohol.  Officer Patrick testified that the numbers were so high that they indicated a false result, and that he smelled the presence of mouthwash, which can cause an extremely high PBT reading. At some point during the investigation, Officer Patrick called, then cancelled, a wrecker.  Officer Patrick administered a second PBT,[2] and the indicator went down.  Freeman contends that the second PBT was below .08, while Officer Patrick stated that it was above the state limit.  Regardless, both agreed that Officer Patrick showed that disputed reading on the videotape. When Freeman used Officer Patrick's prior testimony to cross-examine him about the disputed reading, the following exchange

---

[2]The record indicates that three PBTs may have been administered.  However, Officer Patrick only recalls administering two PBTs, and the record does not contain any evidence or testimony regarding what the reading on the third PBT may have been.

occurred:

> Q: You actually approached Dr. Freeman again on the videotape and told him that your last reading on the PBT was really low.
>
> A: No, sir. I don't recall telling Mr. Freeman about the reading of the PBT.
>
> . . .
>
> Q: Let me show you the transcript again. My question, and I think we're watching the videotape, "The last time you said that the one you gave him was low; is that correct?" And your response was, "Point one, it's not admissible. Being low is my – my dealing of low and your dealing of low can be different." Is that correct?
>
> A: Sir, that's what you're reading. I'm not sure if I said that.

¶11. After observing the PBT reading going down, Officer Patrick was going to let someone come pick Freeman up, as he had concluded his investigation. However, Officer Patrick opined that Freeman then took a "tone" with him, and at that point, Officer Patrick arrested Freeman. Cross-examination elicited the following testimony about Officer Patrick's change of heart:

> Q: And at that point in time, you also asked a question on the videotape whether he had someone to come pick him up, correct?
>
> A: Yes, sir.
>
> Q: And you were going to let Dr. Freeman go?
>
> A: I was going to let him – not let him drive. I was going to let someone drive him that wasn't under the influence of alcohol.
>
> . . .
>
> Q: . . . You had approached him and said you were going to let somebody come pick him up, correct?
>
> A: Yes.

9

Q: So at that point in time, you had completed your investigation as far as you were concerned?

A: At that time, yes, sir.

Q: Dr. Freeman asked why he couldn't drive his vehicle, correct?

A: That's correct.

Q: And at that point in time on the videotape, you demanded he get out of the car and arrested him?

A: Yes, sir. Mr. Freeman then said in a tone you just told me, and also when he stated that to me, as I stated, I was smelling more of the presence of alcohol than mouthwash. I didn't smell mouthwash anymore, and that's when I made up my mind that I was going to take him in for further investigation.

Officer Patrick placed Freeman under arrest for DUI. He handcuffed him, placed him in his patrol car, and transported him to the Madison County Sheriff's Department.

¶12. On December 22, 2010, the county court adjudged Freeman guilty of DUI first offense, speeding, and littering. It found Freeman not guilty of careless driving. Freeman appealed the three convictions to the Circuit Court of Madison County. On January 3, 2012, the circuit court affirmed the county court.

¶13. Aggrieved, Freeman appeals to this Court, raising the following issues: (1) whether the destruction of the videotape, which was the subject of a court order requiring its preservation, deprived Freeman of his due process rights and his right to present a defense pursuant to the Sixth Amendment and Article 3, Sections 14 and 26 of the Mississippi Constitution; (2) whether the DUI and speeding verdicts were not supported by sufficient evidence or were against the overwhelming weight of the evidence; (3) whether the arresting officer lacked probable cause to stop Freeman; and (4) whether the arresting officer lacked

10

probable cause to arrest Freeman for DUI.

## ANALYSIS

¶14. In an appeal from a bench trial, this Court will not reverse the trial court on findings of fact where they are supported by substantial, credible, and reasonable evidence. *City of Laurel v. Williams*, 21 So. 3d 1170, 1174 (Miss. 2009). Questions of law are reviewed de novo. *Id.*

*1. Destruction of the Videotape*

¶15. Pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, "criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984). Thus, a defendant must "be afforded a meaningful opportunity to present a complete defense." *Id.* "To safeguard th[e] right [to present a complete defense], the [U.S. Supreme] Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.' Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Id.* The State thus has a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense." *Id.* at 488-89. This duty applies to impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985). Impeachment evidence is favorable to the accused "so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.*

¶16. Typically, in spoliation-of-evidence cases, this Court applies a three-part test

11

established by the United States Supreme Court to determine whether the State's loss of evidence violates a defendant's due-process rights:

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*State v. McGrone*, 798 So. 2d 519, 523 (Miss. 2001); *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S. Ct. 333, 337-38, 102 L. Ed. 2d 281 (1988). However, this case presents a unique factual scenario that is not adequately addressed by the typical application of the three-part test. In this case, the defendant and the county court deemed the evidence material to the defense, and, as a result, the county court ordered the State to preserve the evidence. Thus, the State was under an affirmative duty via a court order to preserve the video.

¶17.    The video undisputedly shows the moments before the stop, as well as the entire traffic stop. Officer Patrick admitted that the video would clarify material disputed facts, i.e., whether Freeman admitted to drinking alcohol, whether he slurred his words, whether his coordination was impaired, how he was driving immediately prior to the stop, and the interaction between the two men. He further admitted that the video would show the PBT results. The video offered objective evidence of what occurred during the entire traffic stop, and was an imperative part of Freeman's defense, especially for its use to impeach Officer Patrick's testimony. Thus, the loss of the video while the State was under a court order to preserve the video clearly impaired Freeman's defense.

¶18.    In the *Younglood* case, the Supreme Court expressed its concern with imposing "on the police an undifferentiated and absolute duty to retain and to preserve all material that

12

might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. This is clearly not a case in which preserving the destroyed video would have imposed unreasonable requirements on the police to employ guesswork as to what should be preserved, or to preserve an unreasonable quantity of evidence.[3] The evidence in question was specifically requested, and it was the subject of a court order to preserve evidence. Thus, given the court order to preserve the video, the State's duty to preserve the video was certainly reasonable. Further, the evidence was of the nature that it was relatively simple to copy and preserve. Thus, both the prosecutor and the arresting officer had clear, actual knowledge of the import the defense placed on the video prior to it being destroyed. *See Youngblood*, 488 U.S. at 56 n.*. Defense counsel and the court did everything in their power to have the video copied and preserved, yet the State inconceivably ignored discovery requests for a copy of the video and violated the court order imposing an affirmative duty to

---

[3]Unlike most cases on the issue, in which the destruction was a "matter of routine," or "in accord with their normal practice," the destruction in this case was not done pursuant to a routine destruction of evidence policy. *See Trombetta*, 467 U.S. at 488.

13

preserve the video.[4]  The State gives no legitimate reason[5] as to why it failed to follow the court order and preserve the video.  Thus, finding a due process violation in this case comports with the spirit of *Youngblood*.

¶19.    The destruction of the video seriously impaired Freeman's ability to cross-examine Officer Patrick.  "[S]uppression of [impeachment] evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial."  *Bagley*, 473 U.S. at 677, 678.  "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  *Id.*    Certainly, given Officer Patrick's extremely self-contradictory testimony and his admission that the video would resolve multiple disputed material facts, the destruction of the objective video undermines the confidence in the outcome of the trial.  "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."  *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  It is clear that the destruction of

_____

[4]We note that video evidence is different from biological evidence such as DNA samples in that it is much easier to preserve and/or produce to the defense.  It need not be subject to testing or preserved using specialized scientific processes.  The State offers no excuse as to why it did not comply with the discovery requests and the court order, other than that Officer Patrick did not think he had the software on his computer with which to copy the video.  There is no evidence that such software would be difficult to obtain and utilize, especially given the nearly fourteen months that elapsed between the first request for the video and the assertion that the video was destroyed.  In making this distinction, we do not suggest that the loss or destruction of biological or like evidence is any less egregious than the destruction of video evidence.  We merely note that video evidence is likely to be even easier for the State to produce to defendants.

[5]We note that while there may be legitimate reasons to violate a court order, such as a force majeure or the like, the State did not offer one here.

14

the videotape deprived Freeman of the opportunity to properly cross-examine Officer Patrick and to present a complete defense. Thus, such is a constitutional error that undermines the confidence in the outcome and in the administration of justice. On this basis, we reverse and render Freeman's DUI conviction.[6]

*2. Sufficiency of the Evidence Supporting the Speeding Conviction[7]*

¶20.    Freeman argues that the State did not put forth sufficient evidence to support his speeding conviction. He argues this on two grounds: 1) that Officer Patrick was not qualified to operate the specific radar device at issue, and 2) that the "Radar Unit Certification" allowed into evidence was inadmissible hearsay and violated Dr. Freeman's right to confrontation. Because the second issue is dispositive in regard to the admissibility of the radar reading, we need not address whether Officer Patrick was qualified to operate the radar device. However, we ultimately find that sufficient evidence nonetheless supports the speeding conviction.

¶21.    The admission of evidence is within the trial court's discretion. ***Bower v. Bower***, 758

---

[6]Because we reverse Freeman's DUI conviction on the ground of the due process violation, we decline to address Freeman's argument that Officer Patrick lacked probable cause to arrest him.

[7]To the extent Freeman argues that his speeding conviction should be reversed because Officer Patrick lacked probable cause to stop him, this argument is without merit. A traffic stop is reasonable under the Fourth Amendment where an officer has probable cause to believe that a traffic violation has occurred. ***Whren v. United States*** 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996). Officer Patrick determined via his radar that Freeman's speed was 69 miles per hour in a 55 mile per hour zone. He also testified that he estimated the speed by following Freeman. Even if Officer Patrick was operating his radar incorrectly, as Freeman alleges, his testimony establishes a reasonable *belief* that speeding, a traffic violation, has occurred. *See **Harrison v. State***, 800 So. 2d 1134, 1138-39 (Miss. 2001).

So. 2d 405, 414 (Miss. 2000). "[A] radar device reading should be deemed admissible only upon a showing of the radar device's accuracy." **Stidham v. State**, 750 So. 2d 1238, 1241 (Miss. 1999).[8]

¶22. The State inexplicably failed to obtain a certified copy of the Radar Unit Certification. The county court then admitted the uncertified Radar Unit Certification as a business record under Mississippi Rule of Evidence 803(6), with Officer Patrick as the custodian. Freeman argues that Officer Patrick is not a proper custodian to authenticate the uncertified document and that the admission of the document violated Freeman's right to confront the person who performed the radar calibration.[9]

¶23. The admission of the uncertified Radar Unit Certification was improper. Rule 803(6) provides a hearsay exception for records of regularly conducted activity. It allows admission of

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or

---

[8]It is not argued here that tuning forks established the accuracy of the device. *See* **Stidham**, 750 So. 2d at 1241 (holding that tuning forks were acceptable means of proving radar accuracy where two officers testified that tuning forks were used three times the day of the stop and that every time they were used, the radar "checked functional"). Regardless, Officer Patrick testified that he used tuning forks three times on the day of the stop, but notably did not testify as to the results; thus, the record does not reflect whether the forks indicated that the radar was functioning properly. No evidence of the radar device's accuracy was adduced at trial. As far as this Court knows, the test results may have been that the radar was functioning improperly. That information simply is not in the record.

[9]We need not determine whether the Radar Unit Certification is a testimonial statement under the Confrontation Clause, because, regardless of its testimonial nature, it was improperly admitted into evidence.

data compilation, *all as shown by the testimony of the custodian or other qualified witness* or self-authenticated pursuant to Rule 902(11), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

M.R.E. 803(6) (emphasis added). Furthermore, Rule of Evidence 901 provides that authentication is a condition precedent to admissibility and gives illustrations regarding how documents may be authenticated. M.R.E. 901(a). Documents may be authenticated by "Testimony of Witness With Knowledge," which consists of "[t]estimony that a matter is what it is claimed to be." M.R.E. 901(b)(1).

¶24. Officer Patrick clearly does not qualify as a custodian or qualified witness, as he does not have knowledge of the contents of the Radar Unit Certification. *See Bower*, 758 So. 2d at 414-15. He specifically testified that "I really don't know what the technician done. It was in his possession when I left the technician shop" and that "I didn't actually watch [the technician]." Officer Patrick was clearly not a qualified witness, as he was not involved in the preparation of the Radar Unit Certification, nor did he possess the proper knowledge to be able to testify as to its accuracy. *See id.* at 415. Hearsay evidence is inadmissible unless it falls within a "firmly rooted hearsay exception;" otherwise it is subject to a confrontation objection. *Id.* at 414-15. Thus, because the Radar Unit Certification was not properly authenticated, it was inadmissible hearsay and should have been suppressed. Because the record contains no other evidence regarding the radar device's accuracy, the reading is inadmissible, and the county court abused its discretion by admitting it.

¶25. However, sufficient evidence exists to support the speeding conviction. Officer Patrick specifically testified that he estimated Freeman's speed by following, or pacing, him.

17

Cross-examination did not undermine this testimony. While we strongly encourage the State to properly introduce radar readings in the future, under the specific facts of this case, the testimony regarding Officer Patrick's estimations of Freeman's speed by following him is sufficient evidence to uphold the speeding conviction.

## CONCLUSION

¶26. Freeman does not adequately contest that he littered. Furthermore, sufficient evidence exists to support Freeman's speeding conviction. Thus, this Court affirms Freeman's convictions for littering and speeding. Because Freeman's due process right to present a complete defense was irretrievably violated by the loss of the videotape, we reverse and render his DUI conviction.

¶27. **CONVICTION OF SPEEDING AND SENTENCE TO PAY COURT COSTS, FEES AND ASSESSMENTS AND A FINE OF FIFTY (50) DOLLARS, WITH CONDITIONS, AFFIRMED. CONVICTION OF LITTERING AND SENTENCE TO PAY COURT COSTS, FEES AND ASSESSMENTS AND A FINE OF FIFTY (50) DOLLARS, WITH CONDITIONS, AFFIRMED. CONVICTION OF DUI - FIRST OFFENSE, REVERSED AND RENDERED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR.**